BOISE CASCADE CORPORATION and affiliated corporations, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Boise Cascade Corp. v. Commissioner
Docket No. 732-67.
United States Tax Court
T.C. Memo 1974-315; 1974 Tax Ct. Memo LEXIS 1; 33 T.C.M. (CCH) 1443; T.C.M. (RIA) 740315; December 26, 1974, Filed. James L. Berlin and Kenneth L. Pursley, for petitioners. S. Clay Freed, for respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioners' Federal income tax for the calendar year 1962 in the amount of $2,083,368.94. All but one of the issues raised by the pleadings have been disposed of by the parties, leaving *2 for our decision whether a transaction culminating on December 27, 1961, whereby Ames, Harris, Neville Co., a subsidiary of Boise Cascade, acquired an interest in property located in Yakima, Washington, and Koret of California, Inc., acquired an interest in property located in San Francisco, California, qualifies as a like kind exchange under section 1031, I.R.C. 1954. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. Boise Cascade Corporation (hereinafter Boise Cascade) and its affiliates had their principal place of business in Boise, Idaho at the time of the filing of the petition in this case. Petitioners filed a consolidated Federal corporate income tax return for the calendar year 1962 with the district director of internal revenue at Boise, Idaho. Two of Boise Cascade's wholly owned subsidiaries are Ames, Harris, Neville Co. (hereinafter Ames, Harris) and Construction Finance Company (hereinafter Construction Finance). R. W. Halliday (hereinafter Halliday) was a vice president both of Ames, Harris and of Boise Cascade during 1961. Koret of California, *3 Inc. (hereinafter Koret), is a manufacturer of women's ready-to-wear apparel with offices in 1961 and 1962 in California. Koret desired to obtain a parcel of property owned by Ames, Harris in San Francisco in order to establish a production operation, and on June 12, 1961, submitted an offer to purchase the San Francisco property for $370,000. Ames, Harris rejected the offer. Ames, Harris proposed an exchange of properties, with Koret acquiring suitable property to transfer to Ames, Harris in return for the San Francisco property which Koret had offered to purchase. The property which Ames, Harris agreed to accept was unimproved realty located in Yakima, Washington owned by Boise Cascade, its parent, if Koret would first make certain improvements to the property. In 1961 Boise Cascade was considering building a plywood sheathing plant on the Yakima property and, beginning in December 1960, had expended $98,308.05 for fill material to deposit in a log pond on that part of the property which was to be the site of the plant. Boise Cascade addressed a letter to Koret dated June 21, 1961, which stated in part as follows: This document will serve as a letter commitment confirming *4 the oral agreement made today involving a certain parcel of real property located in Yakima, Washington. The undersigned, Boise Cascade Corporation, a Delaware corporation, is the owner of a certain parcel of real property located in Yakima, Washington, adjacent to its saw mill property and consisting of approximately ten acres. The undersigned will cause to be prepared at its cost and expense plans and specifications for the construction of a plywood plan building on the subject property. After completion of the plans and specifications, you will expend $370,000.00 towards the construction of such building pursuant to the plans and specifications. If the cost exceeds $370,000.00, the balance will be borne by the undersigned. The land will be supplied to you by the undersigned, so that the total cost to be incurred by you will be for construction of the building. It is contemplated that construction will commence around July 15, 1961 and will be completed as soon as possible, but not later than December 15, 1961. You will be obligated to spend from your own funds the sum of $120,000.00, and the undersigned will cause to be made available to you an additional sum of $250,000.00 *5 through its subsidiary, Construction Finance Company * * *. Immediately upon obtaining a written loan commitment from Construction Finance Company agreeing to advance the $250,000.00 referred to, you shall forward to Construction Finance Company the sum of $37,000.00, and on October 1, 1961 you shall forward to Construction Finance Company an additional sum of $83,000.00. These amounts shall be expended by Construction Finance Company on your behalf for the construction of the building on the next payments due on the construction contract after receipt of each of said sums. At the option of Construction Finance Company, you will execute a mortgage of your interest in the plywood plant to be constructed pursuant to this agreement. Title to the property on which the improvement will be constructed will at the time of commencement of construction be vested in the undersigned free and clear of all liens and encumbrances, saving and excepting real and personal property taxes due but not yet payable, rights of way, easements and restrictions of record as of this date. You agree that you will enter into a lease agreement between yourself as lessor and the undersigned as lessee covering *6 the plywood plant building. The undersigned as lessee shall pay as rental a sum equal to $44,400.00 per year plus all real and personal property taxes, the cost of insurance, maintenance and upkeep. The lease shall be for a period of fifteen years commencing as of January 2, 1962 or after completion of the building, whichever event shall last occur, and shall contain such other terms and conditions as are usually contained in a net, net, net lease in the area involved. The undersigned shall carry fire and extended coverage insurance on the plant to be constructed in an amount not less than $370,000.00, which policy shall name you and Construction Finance Company as insureds as their interests may appear. The proceeds of said insurance shall be utilized for repair or restoration of the plant. All other risks of loss shall be borne by the undersigned. The undersigned shall have the option to purchase all of your interests in the plywood plant to be constructed at any time after January 1, 1962, by the giving of ten days written notice thereof for the aggregate purchase price of $370,000.00. On June 28, 1961, Koret accepted the terms of the proposal contained in the June 21, 1961, letter *7 from Boise Cascade. A letter dated June 30, 1961, to Koret signed by Halliday on behalf of both Ames, Harris and Boise Cascade, stated as follows: The undersigned, Ames, Harris, Neville Co., a California corporation, is the owner of a certain parcel of real property located in the City and County of San Francisco, State of California. You have offered to acquire said property for the sum of $370,000.00 cash. We have, however, refused to accept your cash offer, but have agreed that you may lease the premises at an annual rental of $37,000.00 per year with the right on behalf of either party to terminate by exchanging your interest in a certain plywood plant building located in Yakima, Washington, for the San Francisco property. As consideration for your acceptance of our counter proposal, we hereby agree and will cause our parent corporation, Boise Cascade Corportion, to agree, that we will hold you harmless for any liability that you may incur for Federal income tax or California State franchise tax purposes by reason of your exchanging your Yakima property for our San Francisco property instead of acquiring the latter on a strictly cash basis. In the event any such liability *8 is asserted against you, you agree to give us prompt written notice thereof, and you further agree that you will not settle or concede any tax liability without our consent. In the event we fail to give our consent and you are compelled to litigate the matter, we shall bear all costs of such litigation, and any final judgment rendered against you by reason of the exchange or lease having occurred in lieu of the cash sale. Boise Cascade obtained an estimate from W.M. Yeaman Construction Company on the cost of the proposed plant to be built at Yakima. On August 21, 1961, Ames, Harris executed a lease of its San Francisco property to Koret for 15 years beginning October 1, 1961, with rental of $37,000 per year commencing January 2, 1962. In accordance with the agreement between Boise Cascade and Koret, on August 22, 1961, Koret and Boise Cascade executed a lease of the Yakima property and plant to be constructed to Boise Cascade from Koret for 15 years commencing October 1, 1961, or after completion of the plant, whichever occurred first, for $44,000 per year payable beginning January 2, 1962. Under the lease Boise Cascade was required to pay all taxes, insurance, repairs and *9 other costs. It was permitted to alter the property, but any improvements became the property of the lessor with Boise Cascade being given the exclusive right to depreciate any such improvements. The lease also provided for insurance proceeds to be paid to Boise Cascade in case of damage to the building which, under the lease, Boise Cascade was required to repair and contained a detailed provision for distribution of proceeds of a condemnation between the lessor and lessee. The lease further provided that if over one-half of the floor space of the building was damaged by fire or other casualty to the point of being untenable Boise Cascade, the lessee, would receive the insurance proceeds and would have the option either to restore the building or terminate the lease and purchase the property for $375,000 less $25,000 for each year of occupancy. The lease provided for a tenancy from month to month if the lessee retained occupancy of the premises after expiration of the term of the lease. The lease contained the following warranty of the lessor: ARTICLE VII - Quiet Possession Section 7.01. Lessor covenants that Lessor is seized of the leased premises and has full right to make *10 this lease, and that so long as Lessor is the owner of the leased premises, Lessee shall have quiet and peaceful possession thereof as against any adversed aim of Lessor or any party claiming under Lessor. Section 7.02. In case the Lessor shall convey or otherwise dispose of the demised premises, all liabilities and obligations on the part of said Lessor as Lessor under the lease herein accruing after such conveyance or disposal shall terminate upon such conveyance or disposal, and thereupon, such liabilities and obligations shall be binding upon any new owner of the demised premises. The lease provided that it might be assigned by the lessee or that the property might be sublet and also provided that the agreement was binding on the successors and assignees of both the lessor and lessee. In a leaseback such as was entered into between Boise Cascade and Koret it is usual procedure that the tenant prepare all plans and specifications, contract for and supervise construction of the facility, disburse all funds (either its own or the contract landlord's), and close the lease transaction either before, during, or after completion of the facilities. It is further usual for the *11 tenant to make, in addition to the construction provided by the funds or cost of the landlord, improvements and additions to the building and/or premises greater than that provided by the landlord through the landlord's funds. Construction Finance, in a letter dated October 2, 1961, agreed to advance Koret $250,000 as a loan at 6 percent interest secured by promissory note, a mortgage on the property, and an assignment of proceeds from the lease of the plant. This letter stated that the loan commitment was "subject to an executed copy of a takeout commitment by The Equitable Life Assurance Society; corporate resolution authorizing the designated officers of Koret of California, Inc., to enter into this transaction; receipt of all security documents; and receipt of $120,000.00." On October 20, 1961, W. D. Eberle and Robert D. Hayes executed a warranty deed on behalf of Boise Cascade conveying a specifically described portion of its Yakima property to Koret, and this deed was delivered to Koret sometime prior to December 27, 1961. As previously agreed, on October 27 Koret executed a promissory note, a mortgage on the real property, and an assignment of proceeds of lease on the *12 Yakima property to Construction Finance in consideration for the $250,000 loan. Koret on the same day, in a letter to Construction Finance, authorized the loan proceeds to be disbursed to Boise Cascade "under whose direction construction will take place * * *." W.M. Yeaman Construction Company, under the supervision of H. T. Long, constructed the plywood sheating plant in cooperation with employees of Boise Cascade. Neither H. T. Long nor W. M. Yeaman, president of the construction company, had any knowledge of any connection of Koret's with the plywood sheating plant. Construction on the plant was substantially completed by June 1962. The total cost of the work, including Yeaman's construction fee, was approximately $450,000. Yeaman billed around $325,000 of this amount, exclusive of the construction fee, from October 1 to December 31, 1961. In a letter dated December 12, 1961, Ames, Harris and Koret entered into an escrow with Western Title Insurance Company to carry out an exchange of properties. The letter, to the extent relevant here, recited the following: The undersigned, Ames, Harris, Neville Co. and Koret of California, Inc. have entered into an agreement whereby *13 the former will exchange certain property owned by it in San Francisco, California, for certain property owned by the latter in Yakima, Washington. In connection with the acceptance of the San Francisco property by Koret of California, Inc., a loan is to be obtained from the Equitable Life Assurance Society of the United States in the principal amount of $250,000. Enclosed herewith is a grant deed from the undersigned, Koret of California, Inc., to the undersigned, Ames, Harris, Neville Co., covering the Yakima County, Washington, property and a grant deed from the undersigned, Ames, Harris, Neville Co., to the undersigned, Koret of California, Inc., covering the San FranciscoCalifornia, property. You are hereby requested and directed to record the two deeds when: (a) You are prepared to issue your standard form of title insurance policy on the San Francisco property insuring title thereto in Koret of California, Inc. free and clear of all liens and encumbrances whatsoever, saving and excepting real property taxes due but not yet payable and Exception No. 2 as shown in your preliminary title report of September 29, 1961 bearing the above escrow number. (b) You have received *14 assurances satisfactory to you from a title company located in Yakima County, Washington, that upon recordation of the deed from Koret of California, Inc. to Ames, Harris, Neville Co., the same title thereto will be vested in Ames, Harris, Neville & Co. as Koret of California, Inc. acquired by deed dated October 20, 1961, from Boise Cascade Corporation, subject only to an unrecorded lease with Boise Cascade Corporation dated August 22, 1961, a mortgage in favor of Construction Finance Company dated October 27, 1961, an assignment of proceeds of lease dated October 27, 1961, and real and personal property taxes due but not yet payable.
(c) You have in your possession the sum of $250,000 available pursuant to irrevocable instructions previously delivered to you from Koret of California, Inc., to be delivered to Construction Finance Company of Boise, Idaho, immediately upon recording a first deed of trust in favor of The Equitable Life Assurance Society of the United States covering the property in San Francisco and securing an obligation not to exceed $250,000. Said sum shall be disbursable to Construction Finance Company the same day as the San Francisco deed is recorded. The cost *15 of title insurance on the San Francisco property shall be borne by Koret of California, Inc., and shall be in the amount of $370,000, representing Koret's aggregate investment in the Yakima County, Washington, property. The cost of recording the deeds and all documentary stamp taxes shall be borne by the undersigned Ames, Harris, Neville Co. All other matters will be handled outside the escrow. On December 15, 1961, Koret executed a deed to the Yakima property upon which the plywood sheathing plant was being built naming Ames, Harris as grantee. On December 19, 1961, Ames, Harris executed a deed, signed by Halliday as vice president and attested by W. D. Eberle as secretary, naming Koret as grantee of the San Francisco property. Both deeds were delivered to the grantee and filed for record on the morning of December 27, 1961. Also on the morning of December 27, 1961, at the "Request of Yakima Title Co.", the deed to Koret of the Yakima property executed on its behalf on October 20, 1961, was filed for record. An affidavit and Real Estate Excise Tax Receipt, signed on behalf of Boise Cascade by LLOYD W. Dinkelspiel, Jr., and stating that the seller's name was Boise Cascade, *16 the buyer's name Koret, the date of the instrument October 20, 1961, the date of delivery October 20, 1961, that the instrument was a deed, and that "the full sales price [of the Yakima property] is $100.00," was filed on December 27, 1961. At the same time, Koret filed a similar affidavit, also notarized on December 15, reciting the "sale" of the Yakima property to Ames, Harris for $370,000. On December 29, 1961, Western Title Insurance Company closed the escrow of December 12, showing in its settlment sheet the exchange of properties, each valued at $370,000 plus the various charges paid in connection with the transfers by Ames, Harris. On January 4, 1962, a document entitled "Satisfaction of Mortgages" was filed in the office of the county recorder of Yakima County, showing that Koret had satisfied the debt to Construction Finance and discharging the mortgage on the Yakima property. On December 27, 1961, both the Yakima property and the San Francisco property were properties either used in trade or business or held for productive use in trade or business. During 1962, Ames, Harris sold the Yakima plant to Vona Realty, Inc., for a total sales price of $370,000. *17 The sale to Vona Realty, Inc., was reported on the 1962 consolidated tax return. This return contained a detailed schedule of capital gains and losses, setting forth numerous items. Among the items on the schedule of capital gains and losses of Ames, Harris were the following: Kind of property:
Yakima plant
Date acquired:
1961
Date sold:
July, 1962
Sales price:
$370,000.00
Basis:
$156,932.11
Long-term gain:
$213,067.89
Among the items on the schedule of capital gains and losses of Boise Cascade the following were shown for the Lumber Division: Kind of property:
12 acres land-plywood plant
Date acquired:
[no information given]
Date sold:
[no information given]
Sales price:
$24,000.00
Basis:
$ 804.48
Long-term gain:
23,195.52
In addition, the Cascade Lumber Division of Boise Cascade showed a sales price and long-term gain of $44.97 in respect of "sale lease back plywood." Respondent in his notice of deficiency determined that Ames, Harris realized no gain on the sale of the Yakima realty upon which the plywood sheating plant was built in 1962 and therefore reduced the income of Ames, Harris for the taxable year 1962 from *18 which a net operating loss of Ames, Harris for the taxable year 1961 might be deductible, giving the following explanation: In the consolidated return, this subsidiary reported a long-term capital gain in the amount of $213,067.89 from the sale of the Yakima plant. In the 1961 Revenue Agent's Report, it was determined that this gain was properly reportable in the year 1961 as the result of a taxable exchange of a building and land located in San Francisco for the Yakima Plant. In 1962, the Yakima Plant was sold to Vona Realty and immediately leased back from them. The increase in taxable income as determined in the 1961 report increases the basis in this plant to an amount equal to the selling price and therefore eliminates the gain reported in 1962. OPINION Section 1031(a) provides that no gain or loss shall be recognized if property held for productive use in trade or business or for investment is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment. [2]Section 1.1031(a)-1(b), Income Tax Regs., states that the words "like kind" have reference to the nature or character of property and not to its grade or *19 quality. It further states: One kind or class of property may not, * * * be exchanged for property of a different kind or class. The fact that any real estate involved is improved or unimproved is not material, for that fact relates only to the grade or quality of the property and not to its kind or class. In this case the parties have stipulated that "on December 27, 1961, both the Yakima property and the San Francisco property were properties either used in trade or business or held for productive use in trade or business." Respondent, however, argues that the properties exchanged were not of like kind since under the facts here shown *20 Ames, Harris owned a fee simple interest in the San Francisco property and Koret did not own a fee simple interest in the Yakima property. Respondent recognizes that this contention of his is purely factual and argues in the alternative that if we determine that Koret did in form own a fee simple interest in the Yakima property on December 27, 1961, when the exchange was made, the substance of the transaction is not the ownership by Koret of a fee simple interest in this property because of the provisions of the lease which Boise Cascade had on the property and of the option Boise Cascade had to purchase the property for $370,000. If respondent is correct in his factual argument that Koret did not have title to the Yakima property, then he would be correct in his legal conclusion that the interest it exchanged for Ames, Harris' title to the San Francisco property was not a "like kind" exchange. As we pointed out in Leslie Q. Coupe, 52 T.C. 394, 405 (1969), "of crucial importance in such an exchange is the requirement that title to the parcel transferred by the taxpayer in fact be transferred in consideration for property received." It was held in Carlton v. United States, 385 F.2d 238 *21 (C.A. 5, 1967), that the immediate repurchase of property with proceeds of a sale or a transaction which in substance is the equivalent of such a sale and repurchase does not meet the requirements of section 1031. This Court stated in that case that if one party to the exchange never acquired the legal title to the property purportedly exchanged for property of the other party, the party who failed to acquire the title did not have a like kind property to exchange. We have carefully analyzed the facts in this case in light of respondent's argument, and on the basis of our analysis conclude that Koret did in fact acquire a fee simple title to the Yakima property. Respondent argues that the deed to the Yakima property was never properly executed and delivered to Koret. He states that the deed was not signed by the proper individuals and apparently argues that it was never actually delivered to Koret prior to the time it was recorded on December 27, 1961. Respondent further contends that his position that title to the Yakima property was never conveyed to Koret is supported by the manner in which the sale of the Yakima property was reported by Boise Cascade and Ames, Harris on *22 the consolidated 1962 tax return. From our review of the evidence, the facts do not support respondent's contention in any respect. The deed which was a stipulated exhibit in evidence is on its face a valid warranty deed, signed on behalf of Boise Cascade by W. D. Eberle, Vice President, and attested by Robert D. Hayes, Assistant Secretary, and properly notarized.It conveys the property described therein to Koret with the statement, "TO HAVE AND TO HOLD The said premises, with their appurtenances unto the said Grantee heirs and assigns foreever." We see nothing irregular on the face of the deed conveying the Yakima property from Boise Cascade to Koret. At the trial a witness who was executive vice president of Koret specifically testified that the deed from Boise Cascade to Koret of the Yakima property was delivered to Koret subsequent to June 12, 1961, and prior to December 27, 1961. Although he could not state the exact date the deed was delivered, he was clear it was delivered on some date prior to December 27, 1961. The testimony of this witness is clear and unrefuted. Furthermore, the inferences in the other evidences of record support the delivery of the deed to the Yakima *23 property to Koret before December 27, 1961. Respondent's argument that the manner of reporting the sale of the property to Vona Realty, Inc., on the 1962 tax return indicates that Koret was never the holder of the title to the Yakima property is likewise unpersuasive. Ames, Harris reported a sale price of $370,000 of the Yakima property as received by it. Respondent in his notice of deficiency determined that the long-term capital gain as reported by Ames, Harris from the sale of the Yakima property for $370,000 was incorrectly reported in 1962 but should have been reported in 1961. Respondent made no determination that any greater amount than $370,000 was received by Ames, Harris for the Yakima property or that in 1962 when the sale was made, Ames, Harris did not hold title to the Yakima property. Respondent at the trial made no comment on and asked no question of any witness concerning the $24,000 reported by the Cascade Lumber Division of Boise Cascade as the sales price of "12 acres land - plywood plant" resulting in a long-term gain of $23,195.52. Petitioners in answer to respondent's argument on brief state that this was additional acreage that was owned by Boise Cascade *24 in the vicinity of the land on which the Yakima plant was built and that only 2.8 acres of land were deeded by Boise Cascade to Koret as the property on which the Yakima plant was built. While the actual acreage of the Yakima property on which the Koret plant was built is not shown, the property conveyed by Boise Cascade to Koret is specifically described in the deed by metes and bounds. Without the plat referred to therein, it would be difficult to determine the exact acreage. However, in our view there is nothing in this record, and respondent's determination, to place any burden on petitioners to show that the Cascade Lumber Division of Boise Cascade did own property in Yakima near its plywood plant in addition to the property conveyed to Koret. Had respondent had a question as to whether the 12 acres of land in Yakima sold by the Cascade Lumber Division of Boise Cascade in 1962 was the acreage under the plant which had been conveyed by Koret to Ames, Harris on December 27, 1961, then respondent should have raised this point either in his pleadings or at the trial and afforded petitioners an opportunity to place an explanation in evidence. In our view there is nothing in our *25 record to connect the 12 acres of land sold by the Cascade Lumber Division of Boise Cascade in 1962 to the land underlying the plywood plant, which land and plant were sold by Ames, Harris in 1962, and there was no responsibility on petitioners to prove there was no connection between the properties. On the basis of the facts here, we conclude that as of December 27, 1961, Koret held title to the Yakima property and exchanged that property for the San Francisco property of Ames, Harris which it wanted to acquire. It is true, of course, that the transaction whereby Koret acquired the title to the Yakima property, which it exchanged for title to the San Francisco property which was held by Ames, Harris, was a planned transaction and we do not doubt that it was planned for tax purposes since it is clear that Ames, Harris was unwilling to effect a sale of the San Francisco property during the year 1961. However, as we pointed out in Leslie Q. Coupe, supra, at 405, it is now well settled that even if a taxpayer has entered into an agreement to sell property but before implementation of the transaction arranges to exchange that property for other property of like kind, *26 he is entitled to the nonrecognition benefits of section 1031.Therefore, the fact that the transaction which gave rise to the exchange was one which was arranged for the purpose of having the exchange effected is immaterial to a determination of whether Ames, Harris is entitled to the nonrecognition provisions of section 1031 with respect to the exchange. It is not clear to us whether respondent argues to the contrary of the above stated proposition. However, the Government apparently conceded in Carlton v. United States, supra, that the fact that a transaction is arranged does not cause the provision of section 1031 to be inapplicable to the transaction. In the Carlton case the taxpayers had, for a number of years, owned a ranch on which they carried on a business. In 1958 a corporation made an offer to buy the ranch and after initially accepting this offer, the parties changed the terms so that the corporation would acquire title to other ranching properties which would be exchanged for the ranch owned by the taxpayer. The taxpayers located the other properties, made all the arrangements with respect to purchasing them in the name of the corporation but before *27 any actual transfer of title decided that it was unnecessary to have duplication of title transfer and therefore had the owners of the other ranch properties transfer them directly to him instead of to the corporation. The taxpayers then transferred their ranch to the corporation and paid the owners of the two ranches transferred to them with the money received from the corporation. As the Court pointed out in that case, it was the deviation of the taxpayers from the original plan which resulted in the problem presented. In that case the Court stated (385 F.2d at 241): Both parties agree that had the appellants followed the original plan, whereby General would have acquired the legal title to the Lyons and Fernandez properties and then transferred the title to such properties to the appellants for their ranch property, the appellants would have been entitled to postpone the recognition of the gain pursuant to section 1031. However, instead of receiving the title to the Lyons and Fernandez properties from General for their ranch property, the appellants received cash and an assignment of General's contract rights to those properties. Thus, the ultimate question becomes *28 whether the receipt of cash by the appellants upon transferring their ranch property to General transformed the intended exchange into a sale. * * * Although the transaction in the instant case was a planned one, the title to the Yakima property actually vested in Koret and that title was exchanged by Koret for title to the San Francisco property owned by Ames, Harris. Thus, the facts here differ from those in the Carlton case in that the plan as made here was carried out by an exchange of deeds to properties. Respondent makes no argument that the fact that the property which Koret acquired was held at the time it was transferred to Koret by the parent of Ames, Harris and the lease and option to purchase were also held by Boise Cascade, the parent of Ames, Harris affects the conclusion to be reached in this case. Respondent in his brief specifically states that he makes no such argument with respect to Boise Cascade and Ames, Harris being parent and subsidiary since "Each is a separate entity and taxpayer and their individuality must be recognized. Coastal Terminals, Inc. v. United States, 320 F.2d 333 (4th Cir. 1963) (approving the acquisition of property from *29 a 60%-owned subsidiary)." We agree with respondent that in accordance with the holding in Coastal Terminals, Inc., the fact that the property which was to be exchanged by Koret for property owned by Ames, Harris was acquired by Koret from the parent of Ames, Harris and the fact that the lease on this property and the option to purchase it was held by the parent of Ames, Harris, does not make the situation different from that which would exist if Boise Cascade and Ames, Harris had been unrelated entities. From what we have heretofore said, it is clear that under our interpretation of the facts there was an exchange of title to real property (the San Francisco property) by Ames, Harris for title to real property (the Yakima plant) held by Koret. Since both of these properties are stipulated to be "properties either used in trade or business or held for productive use in trade or business," this transaction falls clearly within the provisions of section 1031(a) and section 1.1031(a)-1(b), Income Tax Regs., unless, as respondent contends in the alternative, the existence of the lease on and the option in Boise Cascade to purchase the Yakima property causes this property to be different *30 in kind or class from the San Francisco property. In arguing that the properties exchanged were of a different kind and class, respondent apparently does not contend that the fact that there existed a lease on the Yakima property to Boise Cascade causes the property to be of a different kind or class if, in substance, Koret held title to the Yakima property. In our view, it is clear under respondent's regulations that the existence of the lease would not cause the two pieces of real property, each of which was either used in trade or business or held for productive use in trade or business, not to be like kind properties. The existence of the lease would rather affect the grade and quality of the property and not its nature and character, and as respondent's regulation states, "the words "like kind" have reference to the nature or character of the property and not to its grade or quality." (Sec. 1.1031(a)-1(b), Income Tax Regs.) Respondent's position is that because of the nature of the provisions of the lease between Koret and Boise Cascade and the existence of the option in Boise Cascade to purchase the property for $370,000 all Koret in substance acquired was "at the most a *31 fractional interest in a plywood plan to be constructed." Respondent states his position in summary as follows: Prior to the closing on December 27, 1961, Ames, Harris, Neville Co. owned the fee simple title to the San Francisco property. * * * Prior to the closing on December 27, 1961, Koret had invested $370,000.00 * * * towards the construction of a plywood sheathing plant that cost $450,000.00 to build and which plant was subject to a leaseback and further subject to being recalled on a few days notice through the exercise of Boise Cascade Corporation's option to purchase. All Koret could convey to Ames, Harris, Neville Co. in exchange for the San Francisco property was the peculiar interest that it had. Koret at the most had a fleeting, fractional interest in a plywood sheathing building. Ames, Harris, Neville Co. thus relinquished rights to an entire property in exchange for fleeting, fractional rights in a plywood plant building. These differences in rights are substantial and are not of a like kind. Certainly in any situation, the substance of a transaction is to be considered in connection with determining whether its form and substance differ in applying the taxing *32 statutes. However, respondent here seems to be confusing the method of planning a transaction with the substance of the transaction as executed. In our view it is reasonably clear from this record that the entire transaction resulting in the exchange by Ames, Harris of the San Francisco property for the Yakima property, title to which was in Koret, was arranged for tax purposes. Petitioners do not deny this with respect to the Ames, Harris - Koret exchange, but point out, as we have heretofore pointed out, that many exchange transactions are planned after one party has made an offer to purchase property from another party who is unwilling to have the gain on the sale or exchange recognized in the year in which the offer is received. Furthermore, although not as completely clear, it reasonably appears from the facts that it might have been advantageous taxwise to Boise Cascade to lease rather than build itself or purchase its plywood sheathing plant. This is indicated by the fact that in 1962 Boise Cascade's subsidiary, Ames, Harris, sold this plant to a third party for $370,000 and apparently Boise Cascade continued to lease the property. However, even if we assume the entire *33 planning of the exchange between Koret and Ames, Harris was for tax purposes, this fact alone does not cause the substance of the transaction to differ from its form.
Petitioners do not deny that it was never intended that the Yakima property be used by Koret for any purpose except to be exchanged for the San Francisco property of Ames, Harris. However, as pointed out in a number of case, this fact does not affect the substance of the transaction if the legal aspects of the transaction are carried out so as to place proper legal title to the exchanged properties in the parties to the exchange. Leslie Q. Coupe, supra; Carlton v. United States, supra; J.H. Baird Publishing Co., 39 T.C. 608 (1962); and Mercantile Trust Co. of Baltimore et al., Executors, 32 B.T.A. 82 (1935). Respondent finally contends that the fact that the letter agreement of June 21, 1961, between Boise Cascade and Koret, which gave to Boise Cascade an option at any time after January 1, 1962, to purchase all of Koret's interest in the Yakima property by giving 10 days' written notice for the aggregate purchase price of $370,000, caused the title held by Koret *34 to be less than title to real property under the laws of the State of Washington. Respondent in his brief, after referring to the existence of this option, cites certain Washington cases dealing with the rights of the holder of an option against transferees of property on which the option is held where the transferees have notice of the option. Apparently there is some conflict in the law in the State of Washington as to whether an option to purchase property is "an interest in land." In Crowley v. Byrne, 71 Wash. 444, 129 Pac. 113, 115 (1912), the court stated: In Smith v. Bangham, 156 Cal. 359, 104 Pac. 689, 28 L.R.A. (N.S.) 522, it is said: "It has been said that an option to purchase land does not before acceptance vest in the holder of the option an interest in the land. Richardson v. Hardwick, 106 U.S. 252, 1 Sup. Ct. 213, 27 L. Ed. 145; Gustin v. Union School District, 94 Mich. 502, 54 N.W. 156, 34 Am. St. Rep. 361; Phoenix Ins. Co. v. Kerr, 129 Fed. 723, 64 C.C.A. 251, 66 L R.A. 569. On the other hand, there are cases holding that the grant, on a valuable consideration of an option to purchase, constitutes *35 the grantee the equitable owner of an interest in the property. House v. Jackson [24 Or. 89, 32 Pac. 1027]; Kierr v. Day, 14 Pa. 112, 53 Am. Dec. 526; Telford v. Frost, 76 Wis. 172, 44 N.W. 835; Wall v. Railroad Co., 86 Wis. 48, 56 N.W. 367. At any rate, the option vests in the grantee the right or privilege of acquiring an interest in the land, and, when accepted, entitles him to call for specific performance. Hawralty v. Warren, 18 N.J. Eq. 124, 90 Am. Dec. 613; Kerr v. Day, supra; People's Street Ry. Co. v. Spencer, 156 Pa. 85, 27 Atl. 113, 36 Am. St. Rep. 22; Guyer v. Warren, 175 Ill. 328, 51 N.E. 580. Such right, when exercised, must necessarily relate back to the time of giving the option ( People's St. Ry. Co. v. Spencer, supra), so as to cut off intervening rights acquired with knowledge of the existence of the option. A subsequent purchaser with notice of a valid and irrevocable option would certainly take subject to the right of the option holder to complete his purchase." We are of the opinion that as between the parties the option contract gave appellant an interest *36 in the land such as respondents were bound by, having notice thereof, even though, at the time they acquired the quitclaim deed from Sarah J. Waits, appellant had not exercised his option or paid any part of the purchase price; and that upon receiving the deed from Sarah J. Waits within the life of the option, thus evidencing the exercise of the option on the part of appellant and the receipt of the purchase price on the part of Sarah J. Waits, the title acquired by appellant related back to the date of his acquiring the option.
However, the view adopted in more recent Washington cases is that the rights under an option are contractual rights only,even though the optionor by the contract in substance agrees not to sell the property during the time the option is outstanding. In Hopkins v. Barlin, 31 Wash. 260, 196 P.2d 347, 350 (1948), the Court stated that an option to purchase property does not transfer to, nor vest in, the optionee any title or right in rem, but creates only a right in personam to elect whether or not he will accept or decline the offer of the optionor. The thing thus contracted for or sold by the option is not the property itself, but merely the *37 right of election to purchase the property. 55 Am. Jur. 493, Vendor and Purchaser, § 27. The optionor parts only with the right to sell the property to any other person during the time limited, and the optionee acquires only the right to purchase the property in futuro, upon the terms and conditions prescribed by the option contract. James, Option Contracts, 4, § 102. In Thompson v. Thompson, 1 Wash. App. 196, 460 P.2d 679, 681 (1969), the Court stated: The option was supported by adequate consideration since it was included in the original contract to purchase parcel A and consideration was given under the terms of the contract. Wetherbee v. Gary, 62 Wash. 2d 123, 381 P.2d 237 (1963). The terms of the option comprised a contract binding on defendant Thompson as the option giver. The plaintiffs, as holders of the option, held a valuable property right. Correlative to this right, the option giver was under a duty not to "repudiate or make performance impossible or more difficult by conveying the land to a third person." McFerran v. Heroux, 44 Wash. 2d 631, 638, 269 P.2d 815, 819 (1954). It is hard to reconcile the statements in these *38 Washington cases with the facts in the instant case. In the instant case, title to the Yakima property was conveyed by Boise Cascade to Koret with complete knowledge that Koret planned to convey that property to Ames, Harris prior to January 1, 1962, the date the "option" of Boise Cascade to purchase the property became effective. Whether this fact would affect the validity of this "option" we need not decide. Certainly, the contractual right, if any, that Boise Cascade had would not under the facts of this case be an "interest in land" whether or not the contractual right would survive the transfer of the property to an assignee with notice of the existence of the option. While the existence of the "option" in Boise Cascade to purchase the Yakima property, title to which it had conveyed to Koret, under the facts here present might affect the grade or quality of the real property exchanged by Koret for the property held by Ames, Harris, it would not cause the property exchanged by Koret for the Ames, Harris property to differ in kind or class from the Ames, Harris property. Koret held a good legal title to the Yakima property and with the knowledge of Boise Cascade that it was *39 going to do so exchanged it for a "like kind" property held by Ames, Harris. Boise Cascade made no effort to exercise its "option" or in any way indicated that it intended to do so in the future. This differs from the situation of property subject to an option to purchase which has been exercised or a contract of sale. Cf. John M. Rogers, 44 T.C. 126 (1965), aff'd. 377 F.2d 534 (C.A. 9, 1967), in which we held that where an option to purchase property had been exercised and purchase price of property paid prior to purported "exchange" of properties, the transaction was a sale and not an exchange, and Brooks Griffin, 49 T.C. 253 (1967), in which we held that property subject to a contract of sale was, when received in the exchange, held for sale and not for productive use in trade or business or for investment. Whether an unexercised option existing on property might under any circumstances cause the property not to be property which could be the subject of an exchange under section 1031, we need not decide. Here Koret held title to the Yakima property and the parties have stipulated that that property was property used in trade or business *40 or held for productive use in trade or business. With the knowledge and apparently the consent of the holder of the "option," if there still existed such an option, it transferred that title for title to other real property. In our view a like kind exchange was made under these facts. We decide the only issue presented in this case for petitioners, but because of the many issues disposed of by agreement of the parties, Decision will be entered under Rule 155. Footnotes
1. All section references are to the 1954 Internal Revenue Code↩ unless noted otherwise. 2. Sec. 1031(a)↩ Nonrecognition of Gain or Loss From Exchanges Solely in Kind. - No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.