394

LESLIE Q. COUPE AND MAYBELLE COUPE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 861–65.    Filed June 11, 1969.

*Lee M. Galloway*, for the petitioners.
*Gordon B. Cutler*, for the respondent.

404

On June 1, 1960, petitioners entered into an agreement with Southern Pacific Co. (S.P.) to sell S.P. their 188.943-acre farm (Elk Grove property) for $2,500 per acre, plus interest. S.P. made an initial $25,000 deposit. Thereafter in two separate escrow transactions (terminating on August 9, 1960, and January 10, 1961, respectively), S.P. paid in the amounts of $111,982.50 and $343,032.73, respectively, with the instruction that such amounts were to be paid to the *title holders* of the Elk Grove property. The latter amount included $7,657.73 in interest. S.P. thereafter received Elk Grove parcels of 54.793 acres and 134.150 acres in 1960 and 1961, respectively.

Rather than simply transferring title in the Elk Grove property to S.P. and receiving cash, however, petitioners arranged to have it transferred to S.P. after they had entered into certain exchanges for said property, simultaneously with the closing of the two escrows with S.P. After the exchanges were completed they had received title to four parcels of property, called the McEnerney, Sala, Schauer, and Bettencourt properties, respectively. In addition they received cash and a note secured by a deed of trust on the McEnerney property.

On their Federal income tax return for the years 1960 and 1961, petitioners reported their transfers of the Elk Grove property, in part, as tax-free exchanges of property for property of like kind under section 1031 [3] of the Code, in part as a partially tax-free sale of their residence for $20,000, and its replacement by another residence costing $18,000, under section 1034 [4] of the Code, and the balance as a currently taxable sale of property to S.P., upon which they reported their gain as shown in the Findings of Fact. Petitioners are now also contending that their transfer of part of the Elk Grove property for the McEnerney deed-of-trust note also constituted a tax-free exchange under section 1031. In his statutory notice of deficiency, respondent determined the amount of petitioners' capital gains arising from the two transactions and, with the exception of the transfer

---

[3] SEC. 1031. EXCHANGE OF PROPERTY HELD FOR PRODUCTIVE USE OR INVESTMENT.

(a) NONRECOGNITION OF GAIN OR LOSS FROM EXCHANGES SOLELY IN KIND.—No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.

[4] SEC. 1034. SALE OR EXCHANGE OF RESIDENCE.

(a) NONRECOGNITION OF GAIN.—If property (in this section called "old residence") used by the taxpayer as his principal residence is sold by him after December 31, 1953, and, within a period beginning 1 year before the date of such sale and ending 1 year after such date, property (in this section called "new residence") is purchased and used by the taxpayer as his principal residence, gain (if any) from such sale shall be recognized only to the extent that the taxpayer's adjusted sales price (as defined in subsection (b) of the old residence exceeds the taxpayer's cost of purchasing the new residence.

of 1.936 Elk Grove acres for the McEnerney residence, further determined that the gains constituted currently taxable income to petitioners in 1960 and 1961. Assigning a sales price of $4,840 for the Elk Grove residence (1.936 acres at $2,500 per acre), respondent determined that petitioners' capital gain from its sale qualified for nonrecognition treatment under section 1034 of the Code, as petitioners had replaced their residence with one of an equal or greater cost than the $4,840 sales price. Respondent also determined that petitioners received $7,657.73 in interest income in 1961.

In his statutory notice, respondent allowed certain selling expenses to be deducted from the sales price received by petitioner on the determined taxable transactions. In so doing he disallowed certain expenses and reallocated others which petitioner had deducted from the gross sales price of the various parcels in determining their gain.

It is now well settled that when a taxpayer who is holding property for productive use in a trade or business enters into an agreement to sell the property for cash, but before there is substantial implementation of the transaction, arranges to exchange the property for other property of like kind, he receives the nonrecognition benefits of section 1031. *Coastal Terminals, Inc.* v. *United States*, 320 F. 2d 333 (C.A. 4, 1963) ; *James Alderson*, 38 T.C. 215 (1962), reversed on other grounds 317 F. 2d 790 (C.A. 9, 1963) ; *Carlton* v. *United States*, 385 F. 2d 238 (C.A. 5, 1967). Of crucial importance in such an exchange is the requirement that title to the parcel transferred by the taxpayer in fact be transferred in consideration for property received. See *Carlton* v. *United States, supra.* In the instant case, petitioners arranged to have their Elk Grove property exchanged in a variation of a so-called 4-way exchange. Involved in this type of exchange is a taxpayer desiring to exchange property, a prospective purchaser of the taxpayer's property, a prospective seller of the property the taxpayer wishes to receive in exchange, and a fourth party. In a simultaneously executed transaction (usually done through escrow) the fourth party receives the taxpayer's property and sells that property to the prospective purchaser. With the funds he receives, he purchases the prospective seller's property and then transfers that property to the taxpayer. When the smoke has cleared, the taxpayer has exchanged his property in a so-called 1031 transaction, the prospective purchaser has the taxpayer's property, the prospective seller has cash, and the fourth party, with the exception of agreed compensation, nothing. See *Mercantile Trust Co. of Baltimore et al., Executors,* 32 B.T.A. 82 (1935).

The instant transactions involved, in addition to petitioners, S.P. as the prospective purchaser of the taxpayer's property, the owners of the McEnerney, Sala, Bettencourt, and Schauer properties as the

prospective sellers, and Polhemus and Brannely as the fourth party. With the exception of the McEnerney property, petitioners transferred Elk Grove property to Polhemus and/or Brannely, who transferred the property to S.P.[5] for cash. With the cash Polhemus and/or Brannely purchased the above properties and transferred them to petitioners. In the case of the 1960 McEnerney transaction, petitioners exchanged the Elk Grove property with the McEnerneys for the McEnerney property and the McEnerneys transferred the Elk Grove property to S.P. for cash. Since the net result of the transactions was petitioners' receipt of property for property of like kind, petitioners contend that they have met the requirements of section 1031.

Respondent contends that the above actions were little more than a transparent attempt on petitioners part to restructure a taxable transaction into a nontaxable one. The fact remains, however, that when it came time to transfer title to the Elk Grove property, petitioners did not transfer it to S.P., but to other individuals, and insofar as the consideration which they received for the transfer constituted title to property of like kind, they had exchanged their property in tax-free exchanges under section 1031. The deed-of-trust note and the cash they received will be discussed *infra*.

We have not overlooked the fact that with the exception of the McEnerney exchange, the exchanges in issue were with Polhemus and Brannely. Respondent strenuously argues that at all times these men were petitioners' attorneys. From this he concludes that they were also their agents in all of the transactions. He argues that since title in an agent is the equivalent of title in the principal, there could have been no exchange of property between petitioners and Polhemus and Brannely; and that the sale to S.P. by Polhemus and Brannely as petitioners' agents was simply a sale by petitioners.

We agree that the exchange would be meaningless for purposes of section 1031 if Polhemus and Brannely were petitioners' agents for purposes of carrying out the transactions. See *Mercantile Trust Co. of Baltimore, et al., Executors, supra* at 85. But the undisputed evidence establishes that, for the purpose of carrying out the exchanges, Polhemus and Brannely did not intend to be and were not petitioners' agents, but were effectively acting as agents for and on behalf of S.P.

To uphold respondent's position, we would have to find that Polhemus and Brannely entered into the various agreements to purchase the exchange properties and receive title thereto on behalf of the petitioners. The evidence establishes, however, that in fact Polhemus

---

[5] The deeds actually named S.P.'s nominee, the Alameda East Bay Title Co. For sake of simplification, we have grouped S.P. transactions and East Bay transactions as being S.P. transactions.

and Brannely first attempted to have S.P. obtain title to the exchange properties, but when that failed, to have title vest solely in themselves. Being fully aware of the consequences of having title vest in petitioners, they deliberately structured all transactions so that petitioners could not obtain even a vestige of title, legal or equitable, to the exchange properties by virtue of any agreements Polheums and Brannely entered into. Thus, all transactions prior to the actual exchange of Elk Grove property for the exchange properties were in the names of Polhemus and Brannely, as agents for an undisclosed principal (intended to be S.P.) and at no time prior to the final conveyances, intended to be the petitioners.

Though the evidence shows that S.P. refused to take title to the properties in its own name, it also shows that S.P. was willing to allow Polhemus and Brannely to accept and convey title to the exchange properties on behalf of and in place of S.P. It agreed to accept conveyances from the title holders of Elk Grove rather than from petitioners, and when the 1960 and 1961 escrow transactions were consummated, Polhemus, Brannely, and McEnerneys did accept and convey title to the various parcels for S.P. and, in accord with the understanding with S.P., conveyed the Elk Grove parcels to it. We find and hold from this entire record, for the tax consequences flowing therefrom, that Polhemus, Brannely, and the McEnerneys were S.P.'s agents for the various transactions here considered.

Whether S.P. itself acquired legal or equitable title to any of the exchange properties we need not decide, for it is clear that in the instant case petitioners first obtained title to the exchange properties as a result of the simultaneous escrow exchanges of August 9, 1960, and January 10, 1961. Polhemus [6] and the petitioners both testified that for purposes of the exchanges they agreed that any title in the exchange properties vesting in Polhemus and Brannely was not to convey any title, legal or equitable, to the petitioners. In fact, if the proposed exchanges had not taken place Polhemus and Brannely were willing to and did take the risk of being left with title to the properties in their own names, and having to hold them for investment.

Such an arrangement was perfectly valid. Even if Polhemus and Brannely stood in a fiduciary relationship with petitioners, under California law one who stands in a fiduciary relationship with another may engage in an activity adverse or potentially adverse to that of his principal if he makes full disclosure to and receives the consent of his principal, see 2 Cal. Jur. 2d, Agency, sec. 108. Polhemus and Brannely specifically satisfied this requirement so that there could be, and was, no agency between themselves and petitioners even though they maintained an attorney-client relationship.

---

[6] At the time of trial Brannely was deceased.

There is also no question but that when Polhemus and Brannely entered into agreements to purchase property in their own names or as agents for an undisclosed principal, under California law they became personally liable under the agreements, because the agreements under those circumstances are considered to be theirs for purposes of affixing liability under them. See 2 Cal. Jur. 2d, Agency, sec. 139.

To say that Polhemus and Brannely were petitioners' agents when they entered into the various agreements would be in direct contradiction to the fact that they had agreed not to be such, and were in fact de facto agents of S.P., obtaining title to the properties for that company, not petitioners. The only juristic facts in the instant case involve bona fide exchanges of Elk Grove properties and the exchange properties between petitioners, Polhemus and Brannely and the McEnerneys. With respect to the exchange properties, there was no sale for cash under California law between S.P. and the petitioners and we so find and hold. To hold otherwise would be to create a legal fiction which did not occur and substitute it for the substantive facts which did. As we pointed out in *Mercantile Trust Co. of Baltimore et al., Executors, supra* at 86–87:

Respondent admits that the transaction was carried out in a legal manner, and that no fraud was perpetrated. We cannot find that it was a mere device, essentially fictitious. The several agreements and deeds executed, and the cash payments made by the four interested parties were not simulated transactions. They were intended to and did constitute juristic facts—not fictions. The agreements created fixed liabilities. The deeds transferred legal title. The cash payments were real. Petitioners actually conveyed the Baltimore Street property to the Title Co. They likewise received from that company, in exchange, the Lexington Street property and $33,000. These real transactions must here be given their normal effect. So, our single inquiry is whether these facts bring the petitioners in the pending transaction within the scope of the quoted statutory provisions. *Gregory* v. *Helvering*, 293 U.S. 465; *Royal Marcher*, 32 B.T.A. 76.

The obvious purpose and effect of these provisions, as well as their predecessors, in the Revenue Act of 1921, section 202 (c) (1),[2] (d) (1),[3] and (e),[4] and the amendment of the Act of March 4, 1923, was to permit the postponement of recognition of taxable gain or loss upon an exchange there described until the disposition of the property received in the exchange. In the ultimate analysis of the present transaction, this was all petitioners intended or accomplished.

The present exchange was not connected with a corporate reorganization. Neither in the last-quoted provisions nor in their successors, here applicable, does there appear any express or implied indication of a legislative intent to premise the nonrecognition of gain or loss there provided upon any other condition than that stated specifically therein. Compare *Gregory* v. *Helvering, supra*, which construed subsections (g) and (i) (1) (B) of the same section (112) and Revenue Act (1928) here under consideration. Nonrecognition of gain or loss

does not depend here upon the impossibility of a sale of the property by the taxpayer. The only condition precedent to that nonrecognition is the actual exchange of property held for investment for like property to be held for investment, with or without so-called "boot." Cf. *John S. Garvan,* 23 B.T.A. 817; *George E. Hamilton,* 30 B.T.A. 160; *Loughborough Development Corporation,* 29 B.T.A. 95; *W. H. Hartman Co.,* 20 B.T.A. 302; *Sarther Grocery Co.,* 22 B.T.A. 1273.

In the cited case of *Gregory* v. *Helvering, supra,* the Supreme Court determined the taxable status of the questioned transaction "by what actually occurred"— the receipt of the taxed stock by the taxpayer. To sustain respondent upon the present record, we would be compelled to ignore the exchange that actually occurred, and tax, as received by the taxpayers, money never, in fact, received by or for them, in a sale that did not occur. We cannot here thus substitute fiction for fact.

- [Footnotes omitted.]

Respondent next contends that by the time the exchanges took place Elk Grove property title was effectively in S.P. and petitioners no longer had the requisite economic interest to convey to either Polhemus, Brannely, or the McEnerneys. In this regard, respondent makes the following argument:

Although federal law determines the tax consequences of a taxpayer's interest in property, the nature of that interest is determined by state law. *Aquilino* v. *United States,* 363 U.S. 509 (1960); *Comm'r.* v. *Crichton,* 122 F. 2d 181 (5th Cir. 1941). Under applicable California law, the execution of the Sales Contract by petitioners effectively disposed of their Elk Grove Farm: SP became the equitable owner of the property, and petitioners were vested with a contractual right to receive the sales proceeds, coupled with a vendor's security title subject to divestment upon performance of the Sales Contract. 50 Cal. Jur. 2d, Vendor and Purchaser, secs. 92–94, 118; 18 Cal. Jur. 2d, Equitable Conversion, sec. 12. Hence, petitioners' rights under the Sales Contract were a chose in action, *a right to cash,* the subsequent exchange of which would not qualify as like kind of property under section 1031. *Comm'r* v. *P. G. Lake, Inc.,* 356 U.S. 260 (1958). [Emphasis supplied.] [7]

As was pointed out in *Coastal Terminals, Inc.* v. *United States, supra* at 337, the transactions in this area are viewed as a whole and are not to be broken down into their components for the purpose of examining the quality of the interests in the various properties at any given time. The statute only requires that as the end result of an agreement, property be received as consideration for property transferred by the taxpayer without his receipt of, or control over, cash. All that is required is that taxpayer retain his bundle of rights in the property until the exchange takes place. If the statute were to be interpreted as respondent contends, all agreements which in the first instance call for cash as consideration for the transfer of property, even if followed by a bona fide exchange, would fail to qualify for section 1031 treat-

---

[7] It is noted that petitioners did not have "a right to cash" under the June 1, 1960, agreement with S.P. since S.P. had the right to pay in part with "exchange property."

ment, as the taxpayer would have no more than a chose in action at the time of the exchange in those cases also.

That the statute is not to be interpreted as respondent contends is shown by the decision in *Coastal Terminals, Inc., supra*, where a sales agreement followed by the substitution of property for a promise to pay cash was upheld as a valid 1031 exchange, since in the final analysis only property was received for property. It is to be noted that in that case the property to be exchanged was not even in existence at the time the agreement was entered into.

Our opinion in *John M. Rogers*, 44 T.C. 126 (1965), affd. 377 F. 2d 534 (C.A. 9, 1967), though using language similar to that in respondent's brief, is inapposite. In that case, Standard Oil exercised an option to purchase taxpayer's property, deposited cash for the taxpayer's account in escrow, and demanded title to the property on December 26. It was not until the following January 19, that the taxpayer exchanged title with a third party and that party transferred title to Standard Oil. By that time, however, there was nothing for the taxpayer to convey or receive, as the cash paid for the property was at the taxpayer's disposal and only Standard Oil had the right to title to the property. In the instant case, in the 1960 transaction, S.P. specifically agreed to allow petitioner to exchange Elk Grove parcels prior to its receiving title to the Elk Grove property and instructed the escrow agent to pay cash to the *title holder* (rather than to the petitioners) when the property was placed in escrow. This arrangement, as performed by the parties, resulted in a modification of the original agreement, Cal. Civ. Code secs. 1698, 1700 (West 1954) ; *James Alderson, supra* at 221, and we find and hold that it was sufficient to recast the agreement between S.P. and petitioners so that petitioners did transfer title to the owners of the exchange properties.

The 1961 transactions were also the result of a modification of the original sales agreement, which allowed petitioners to exchange Elk Grove property for property of like kind rather than for cash. Respondent contends that S.P., in its escrow instructions for that transaction, did not agree to substitute anybody for petitioners as sellers of the Elk Grove property and consequently did not agree to purchase the property from anyone else. But no matter what S.P.'s escrow instructions, the transaction by which S.P. obtained title to Elk Grove was that property's conveyance by Polhemus and Brannely to S.P. on January 10, 1961. Since the June 1 sales agreement did not give S.P. the right to the Elk Grove property until 1 year after the August 9, 1960, conveyance, S.P. could not have demanded title from petitioners for approximately 8 more months without the modification of the agreement as performed. Unlike the situation in *Rogers*, S.P. had no right to title in the Elk Grove property even after it placed the pur-

chase price in escrow and unlike the taxpayers in *Rogers*, petitioners had valid title to convey to Polhemus and Brannely. As in the 1960 transaction, Brannely and Polhemus' title had substance and their transfer of Elk Grove title to S.P. was not the meaningless formality that it was in *Rogers*.

At the time of the agreement with S.P., the Elk Grove property was held for productive use in the farming business and the property received when the exchange took place was of like kind. The property petitioners received was in exchange for the Elk Grove property. Thus we find and hold that petitioners' 1960 exchange of their Elk Grove property for the McEnerney property and the Sala properties, and the 1961 exchange of their Elk Grove property for the Schauer and Bettencourt properties, satisfied the provisions of section 1031.

With the exception of an adjustment as to allowance of a deduction for attorneys' fees, we hold for respondent on the remaining issues.

Petitioners' claim that their exchange of Elk Grove property for the McEnerney deed-of-trust note was a tax-free exchange under section 1031 must fail, as section 1031 specifically excludes exchanges of notes from nonrecognition treatment. Indeed, even if exchanges of notes were not excluded by the statute, the exchange in the instant case was not an exchange of notes, but was an exchange of land for a note and therefore did not constitute an exchange of property for property of like kind. See *Imperator Realty Co.*, 24 B.T.A. 1010 (1931). We therefore hold that the exchange for the deed-of-trust note constituted a taxable transaction.

Petitioners' attempts to structure the 1961 transaction so that they would receive $20,000 for their residence, and not recognize the $7,657.73 interest payment by S.P. or the $6,000 "profit" by Polhemus and Brannely from the amount S.P. paid into escrow are without substance.

The evidence presented by petitioners clearly established that these transactions were structured as they were primarily for tax-avoidance purposes. Since section 1031 requires only that property of like kind be exchanged, we upheld petitioners' exchanges with Polhemus and Brannely as nontaxable. However, in light of the close relationship existing between those men and the petitioners, the intricate planning on the part of Polhemus for petitioners' benefit, and the lack of any substantial adverse interest in their negotiations, their dealings cannot be described as "arm's length." If there is substance to the transaction, the form specifically prescribed by the statute controls. *Herman Glazer*, 44 T.C. 541, 545 (1965) ; *Victor H. Heyn*, 39 T.C. 719 (1963).

We do not find a rational basis to support petitioners' attempt to attach a $20,000 sales price to their residence located on 1.936 acres

of the Elk Grove property. At the time they transferred their property to Brannely and Polhemus, petitioners had agreed to sell their Elk Grove property for $2,500 per acre, no matter what structures were on any particular parcel. Consequently, all they could expect to receive was $4,840 (either in cash, or exchange property) for the 1.936-acre parcel containing their residence. Polhemus and Brannely were well aware that they had no choice other than to convey that parcel to S.P. upon receiving it and that they would receive $4,840 from S.P. for the parcel.

The $15,160 difference which petitioners received was simply a part of the funds to which they were entitled for conveying the balance of the Elk Grove property at $2,500 per acre. Consequently, we have upheld respondent's determination that petitioners received $4,840 for the residence and could use only that figure for purposes of computing the nonrecognized gain under section 1034 of the Code. For similar reasons, we also find that the sales price of each Elk Grove acre transferred was $2,500.

We similarly reject the contention that Polhemus and Brannely made a $6,000 "profit" on the 1961 transaction rather than earning a legal fee. Though Polhemus and Brannely did accept certain risks in receiving and conveying title to the property, we find that that figure was the amount which Polhemus and Brannely were to receive for their efforts in arranging the 1961 transactions for petitioners' benefit. To consider that amount to be "profit" to Polhemus and Brannely on a judicious purchase of realty when the ultimate sales price was known to all parties, and the holding period of fleeting length, would ignore the tremendous efforts which they spent in arranging the various transactions as petitioners' attorneys. Thus, we find that the $6,000 amount was in fact a legal fee paid out of petitioners' proceeds from selling its Elk Grove property. It was not a reduction of the Elk Grove property's sales price. Consequently, we find and hold that that amount is to be considered as part of the sales price received by petitioners.

Petitioners' attempt to avoid reporting the $7,657.73 in interest paid by S.P. pursuant to the June 1 agreement and received by petitioners does not have any basis in form. That amount represents interest accruing on S.P.'s obligation to purchase the Elk Grove property under paragraph 4 of the June 1, 1960, agreement. Though petitioners transferred record title to the Elk Grove property to Polhemus and Brannely, there is not one scintilla of evidence to show that petitioners ever transferred their right to receive the interest to them. Consequently, at all times, petitioners retained the right to collect $7,657.73 in interest from S.P. Polhemus and Brannely's receipt

of the amount through the escrow process meant nothing more than that they were conduits for petitioners and their conveyance of such amount to petitioners was in no way connected with any exchange of any properties. We thus find and hold that petitioners had and received $7,657.73 in interest income in 1961.

Having determined the nature of the transactions surrounding petitioners' disposition of their Elk Grove property, the only issue remaining is the allowable expenses petitioners may claim in regard to the presently taxable transfers of their Elk Grove property, i.e., 24.873 acres in 1960 and 70.614 acres in 1961. Since the McEnerney, Sala, Bettencourt, and Schauer transactions, along with petitioners' sale of their old residence and replacement with a new one, were tax-deferred transactions, and expenses pertaining to the related Elk Grove property dispositions were not currently deductible, we need not and do not decide the amount of the unrecognized gain on those transactions. Consequently, the following pertains only to those items affecting the currently taxable transactions.

In his statutory notice of deficiency, respondent allocated petitioners total sales commissions to Grant and total survey costs of the Elk Grove property equally over each of the 188.943 acres and allowed them as selling expenses in the year the various parcels were sold. He also allocated the 1961 title insurance, revenue stamps, and recording expenses equally to each acre transferred by petitioners. Petitioners offer no serious objection to these allocations and, in light of the lack of any evidence in support of a different allocation, we find them to be entirely proper. See *Wellesley A. Ayling*, 32 T.C. 704 (1959); *Fairfield Plaza, Inc.*, 39 T.C. 706 (1963). Petitioners' escrow statements for 1960 in regard to the 24.873 acres transferred to S.P. show charges of $346, $68.75, and $2.80 for title insurance, revenue stamps, and recording fees, respectively. Respondent allowed these amounts as deductible expenses and we find that the escrow statements accurately reflected the cost of transferring that parcel. Thus, we allow the above-stated costs as deductible selling expenses.

Respondent disallowed any deduction as a selling expense of the $5,000 and $6,000 payments to Brannely and Polhemus in 1960 and 1961, respectively. Respondent also disallowed the $114.40 payment constituting the cost of the title fee in connection with McEnerney note transaction. Respondent determined all three of these items to be expenses incurred in the acquisition of property.

We uphold respondent's disallowance of the $114.40 title fee in connection with the McEnerney note as a selling expense, as it is clear that that expenditure was for the purpose of perfecting petitioners' title in the McEnerney property. It was not a cost of disposing of the Elk Grove property.

Respondent's disallowance of the $5,000 and $6,000 amounts received by Brannely and Polhemus in 1960 and 1961 finds support in Polhemus' testimony that both he and Brannely were hired for, and their efforts were almost entirely directed toward arranging the exchange of the properties. Respondent contends that under such circumstances any portion of either payment considered to be for petitioners' disposition of Elk Grove property is negligible and should be disregarded. The record, however, does indicate that Polhemus spent a substantial amount of time in preparing the necessary documents required for the disposition of Elk Grove, and we find and hold that of the amounts received by Polhemus and Brannely during 1960 and 1961, $1,000 and $1,200, respectively, represent selling expenses pertaining to the dispositions of Elk Grove property; the $1,000 amount to be allocated equally over the 54.793 acres transferred in 1960 and the $1,200 amount to be allocated equally over the 134.150 acres transferred in 1961. *Cohan* v. *Commissioner*, 39 F. 2d 540. The balance of the amounts ($4,000 in 1960 and $4,800 in 1961) was paid in connection with the acquisition of the Sala, McEnerney, Bettencourt, and Schauer properties and as such are currently nondeductible expenditures. Petitioners would have us separately allow a portion of the $5,000 and $6,000 payments as currently deductible fees incurred in obtaining tax advice, but both fees pertain to a capital transaction and can therefore only represent a part of the basis of the property acquired, or a selling expense of the property sold. Cf. Rev. Rule 67-125, 1967-1 C.B. 31.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

DRENNEN, *J.*, dissents.

―――

SIMPSON, *J.*, concurring: I agree with the results of the majority opinion, but my reasons are somewhat different.

Occasionally, the tax consequences of a transaction are governed by the form in which it is cast. *Commissioner* v. *Lester*, 366 U.S. 299 (1961); *Chester L. Tinsman*, 47 T.C. 560 (1967). However, generally, tax consequences turn upon substance. Taxpayers are not permitted to circumvent the restrictions in the law by mere formal compliance; nor should they be deprived of a tax benefit when in substance they are entitled to it merely because they accidentally or unwisely chose the wrong form. If tax consequences were based upon form, the results would be a capricious application of the tax law. Relying upon substance results in a more equitable application of the law.

In my opinion, the substance of the transactions in this case is that the petitioners exchanged business property which they desired to relinquish for other business property which they wished to operate.

I see no reason for reading the statute restrictively and limiting it to a bilateral exchange of properties. The petitioners desired to transfer their property and found a purchaser who wished to acquire it. However, the purchaser owned no property suitable for an exchange and did not wish to take title to any such property merely for the purpose of trading it. Thus, the petitioners paid their attorneys to find other property which they could accept in exchange, and the attorneys effected the necessary exchanges. In summary, the petitioners were the moving force; it was through their planning and efforts that the exchanges were arranged. In my view, it should make no difference whether the traded property was first transferred to the agents of S. P. so that S. P.'s agents could effect a bilateral exchange with the petitioners. To hold that section 1031 applies when the traded property is first transferred to S. P. or their agent, but not otherwise, places a premium on formal compliance with the law. So long as the ultimate effect of the several exchanges of property is that the petitioners have transferred business property and acquired like business property, I believe section 1031 should apply.

If the petitioners had sustained a loss as a result of the transactions and were arguing that it should be recognized, I would not be beguiled by all that took place in this case; I would hold that the step transaction doctrine should be applied, that in substance there was an exchange of business property for business property, and that the loss is not allowable. In my judgment, an even-handed application of the law calls for us also to apply the step-transaction doctrine when the taxpayer realizes a gain.

------

RAUM, J., dissenting: I cannot agree that there was an "exchange" of property in this case. Plainly, there is no "exchange" under section 1031 where the seller of property merely uses the proceeds of sale to purchase other like property, cf. *Trenton Cotton Oil Co.* v. *Commissioner*, 147 F. 2d 33, 36 (C.A. 6) ; *John M. Rogers*, 44 T.C. 126, affirmed per curiam 377 F. 2d 534 (C.A. 9), notwithstanding that there may be an "exchange" where the seller persuades the purchaser to acquire other property desired by the seller and to substitute such other property for the purchase price, cf. *Coastal Terminals, Inc.* v. *United States*, 320 F. 2d 333 (C.A. 4). The difficulty here is that the purchaser, Southern Pacific Co., was unwilling in turn to purchase other properties to be used in "exchange" for the Elk Grove property that it was purchasing from petitioners. The majority opinion gets around this difficulty by concluding that Polhemus and Brannely, petitioners' attorneys who purchased the other properties, were acting as agents for Southern Pacific, a conclusion that appears to me to be wholly

unsupported. Polhemus and Brannely were not agents for Southern Pacific, and there was no "exchange" of like properties between petitioners and Southern Pacific.

Nor is there any support for the theory suggested in the concurring opinion, relying "upon substance" to achieve "a more equitable application of the law." Concededly, the statute as written does not apply where the seller merely uses the proceeds of the sale to buy other property. And that is all that occurred here. The fact that an exchange could theoretically have been arranged so as to make the statute applicable may be unfortunate for petitioners, but that unhappy result is brought about by Southern Pacific's unwillingness to participate in such manner. I can see no reason for rewriting the statute; its terms are specific. See *Trenton Cotton Oil Co.* v. *Commissioner*, 147 F. 2d at 36. Where Congress wanted to permit nonrecognition upon the reinvestment of proceeds, it expressly did so in the case of the sale of a residence in the closely related provisions of section 1034.

TIETJENS and WITHEY, *JJ.*, agree with this dissent.