FRED L. FREDERICKS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Fredericks v. Commissioner
Docket No. 19161-91
United States Tax Court
T.C. Memo 1994-27; 1994 Tax Ct. Memo LEXIS 26; 67 T.C.M. (CCH) 2005; January 24, 1994, Filed *26 Decision will be entered for petitioner. For petitioner: Charles P. Duffy, Philip N. Jones, Peter J. Duffy. For respondent: Shirley M. Francis. RUWE
RUWE
MEMORANDUM FINDINGS OF FACT AND OPINION RUWE, Judge: Respondent determined a deficiency of $ 1,033,941.00 in petitioner's Federal income tax for 1983 and an addition to tax of $ 258,485.25 pursuant to section 6661. [1]
The issues for decision are: (1) whether petitioner exchanged real property within the meaning of sectoin 1031(a); (2) if so, whether petitioner must recognize any gain on the exchange under section 1031(b); and (3) whether petitioner is liable for the addition to tax as determined by respondent. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations of fact and attached exhibits are incorporated herein by *27 this reference. Petitioner resided in Santa Ynez, California, when he filed his petition. On or about January 7, 1980, petitioner and four other individuals acquired interests in Wildridge Apartments, a 305-unit apartment complex, located in Colorado Springs, Colorado. Petitioner held a 90.83-percent interest in Wildridge Apartments and the other four cotenants held a combined minority interest of 9.17 percent. Petitioner acquired his interest in Wildridge Apartments by selling to the four minority owners an undivided 9.17-percent interest in the pending acquisition of Wildridge Apartments for $ 400,000, by exchanging certain apartment units known as Parkdale and wholly owned by petitioner, and by executing an 18-month "wrap around" note in the amount of $ 4 million. In the latter part of 1980, petitioner began attempts to obtain permanent long-term financing for Wildridge Apartments. Petitioner had difficulty obtaining such financing since interest rates continued to rise and lenders "kept backing out". As of September 28, 1981, the interest rate on the 18-month promissory note was 23.5 percent. Under an extension agreement dated September 24, 1982, petitioner was able to *28 extend the original due date (June 7, 1982) on the 18-month promissory note to July 9, 1983, by making a $ 500,000 payment. On April 12, 1983, the Savings Bank of Puget Sound signed a loan commitment letter for the refinancing of Wildridge Apartments in the amount of $ 6 million. On May 27, 1983, petitioner signed a promissory note for $ 6 million, executed a Deed of Trust, Assignment of Rents, and Security Agreement in favor of the Savings Bank of Puget Sound. On June 2, 1983, the loan transaction settled, and, after paying the underlying indebtedness and settlement charges, petitioner received net loan proceeds of $ 2,020,407.33. On March 6, 1981, more than 1 year following petitioner's acquisition of Wildridge Apartments, petitioner entered into an "Option Agreement" with the J. and M. Brock Living Trust (Trust) to purchase certain parcels of unimproved real property, consisting of approximately 11 acres located in Buellton, California (Buellton Property). [2] The option period was to end September 6, 1982. Petitioner paid $ 50,000 for the option. Along with entering into the "Option Agreement", the parties executed (1) "Agreement Re Interpretation of Option Agreement and *29 Purchase Agreement and Escrow Instructions" [3] and (2) "Purchase Agreement and Escrow Instructions." [4]
*30 On August 12, 1982, in consideration of an additional $ 50,000, the Trust extended the above option to September 6, 1983. The terms of this new option agreement were substantially similar to, and consistent with, the first option and attending agreements. Fred L. Fredericks, Inc. (Company), made the $ 50,000 payment for the extension of the option. Company later credited petitioner for the $ 50,000 he paid for the initial option. Petitioner was the sole shareholder of Company. Company conducted business as a licensed building contractor and as a real estate developer. On February 25, 1982, Fred L. Fredericks Realty, Inc. (FLFRealty), a licensed real estate broker, listed Wildridge Apartments for sale at a price of $ 9,200,000. Petitioner was the sole shareholder of FLF Realty. In 1983, petitioner retained Paul Hamilton Co., an unrelated company, to sell Wildridge Apartments. As early as May 4, 1983, petitioner and BHS Realty, Ltd. (BHS Realty), an unrelated limited partnership, had agreed on certain terms of sale of Wildridge Apartments. On or about May 20, 1983, petitioner, on behalf of himself and the minority owners of Wildridge Apartments, and BHS Realty entered into *31 an "Agreement of Purchase and Sale With Closing Instructions" concerning the sale of Wildridge Apartments. The agreed purchase price was $ 9,180,000. Under section 11.11 of the agreement, petitioner disclosed to BHS Realty that prior to the close of escrow, petitioner intended to arrange a like-kind exchange within the meaning of section 1031, whereby petitioner would exchange Wildridge Apartments subject to the terms and provisions of the agreement, for other property owned by Company. In the event this occurred, BHS Realty agreed to purchase Wildridge Apartments from Company. Petitioner signed the agreement and, in his capacity as president of Company, also signed the agreement acknowledging that Company had read and understood all the terms and provisions. Pursuant to section 1.2(a) of the agreement, on or about May 20, 1983, BHS Realty deposited $ 200,000 in an escrow account with Safeco Title Insurance Co. (Safeco Title). On June 10, 1983, petitioner entered into an "Agreement of Exchange of Property" with Company, whereby petitioner was to convey Wildridge Apartments to Company. Pursuant to the agreement, Company, as "the owner and developer of certain real property in *32 Buellton, California, consisting of approximately 11 acres", [5] was to (1) construct certain improvements prior to July 1, 1988, including a restaurant, hotel, and movie theater/ice cream parlor complex, and (2) transfer the improved property to petitioner. For its services, Company was to receive the sum of $ 750,000. Petitioner signed the "Agreement of Exchange of Property" in two capacities, individually and as president of Company. There were no other parties to the agreement. On June 27, 1983, petitioner conveyed Wildridge Apartments by grant deed to Company. The deed was recorded on July 13, 1983. Company then sold Wildridge Apartments to Wildridge Apartments, Ltd., an unrelated California limited partnership, for $ 9,180,000. Wildridge Apartments, Ltd., had been created and substituted as purchaser of Wildridge Apartments by the principals of BHS Realty. The conveyance of title to Wildridge Apartments, Ltd., *33 was likewise made by grant deed dated June 27, 1983, and the deed was recorded on July 13, 1983. On June 30, 1983, pursuant to the escrow instructions, the $ 200,000 escrow deposit was released to Company from the sales escrow by Safeco Title, the escrow agent. Upon the closing of escrow, Wildridge Apartments, Ltd., (1) executed a "Purchase Money Promissory Note" to Company as holder in the amount of $ 1,490,000; [6] *34 (2) executed a "Deed of Trust, Assignment of Rents and Security Agreement" dated July 13, 1983, in favor of Company; and (3) paid the balance of the purchase price to Company. [7] On or about July 22, 1983, the minority owners of Wildridge Apartments were paid $ 245,178 by Company, representing their share of the sale proceeds. On July 14, 1983, Company, through escrow, paid FLF Realty a $ 125,000 listing commission. On September 19, 1983, Company paid Paul Hamilton Co. a $ 170,000 sales commission. On August 26, 1983, Company purchased and acquired the Buellton Property for $ 1,895,827, consisting of $ 379,165 in cash and a promissory note for the balance. The Buellton Property was conveyed by grant deeds, consisting of an undivided 20-percent interest from the J. and M. Brock Living Trust and an undivided 80-percent interest from the California Polytechnic State University Foundation for the Parks and Brock Unitrust. The grant deeds were recorded on September 1, 1983. On December 1, 1984, petitioner and Company entered into an agreement for the lease of the Buellton restaurant parcel. Petitioner leased the restaurant parcel from Company during the months of December 1984 and January 1985. Upon completion of the construction, Company conveyed the restaurant and theater/ice cream parlor parcels to petitioner *35 by grant deed dated December 27, 1984. On September 15, 1986, by grant deed, Company conveyed the hotel to petitioner. Company was credited with its $ 750,000 contractor's fee for the development of the Buellton Property as follows: $ 200,000 for the restaurant in February 1985; $ 100,000 for the theater/ice cream parlor in March 1985; and $ 450,000 for the hotel in September 1986. The Buellton Property, with all improvements, had a value based upon cost of $ 17,484,872, consisting of $ 2,249,664 for the restaurant, $ 1,087,506 for the theater/ice cream parlor, and $ 14,147,702 for the hotel. As provided in the exchange agreement, petitioner expended $ 271,094 in cash and assumed $ 8,004,707 in additional debt. Petitioner filed a joint Federal income tax return for the taxable year 1983 with Paula R. Fredericks, from whom he is now divorced. On his 1983 income tax return, petitioner reported no gain or loss with respect to the Wildridge Apartments. In the notice of deficiency, respondent determined that petitioner failed to report $ 2,288,390 of capital gain resulting from the sale of Wildridge Apartments. OPINION Issue 1. Section 1031(a)
Section 1001(c) requires that *36 the entire amount of the gain or loss on the sale or exchange of property shall be recognized. Section 1031(a), however, provides for the nonrecognition of gain or loss when property held for productive use in a trade or business or for investment is exchanged solely for like-kind property that is to be held for productive use in a trade or business or for investment. [8]
There is no question that Wildridge Apartments and the Buellton Property were of like kind within *37 the meaning of section 1031.[9] The parties disagree, however, on whether petitioner "exchanged" Wildridge Apartments for the Buellton Property. Respondent's determinations are presumed correct, and petitioner has the burden to establish that they are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Essentially, section 1031(a) assumes that new property received in an exchange is substantially a continuation of the old investment. See Commissioner v. P.G. Lake, Inc., 356 U.S. 260, 268 (1958). In an exchange of like-kind property, petitioner's economic situation after the exchange is fundamentally the same as it was before the exchange. Koch v. Commissioner, 71 T.C. 54, 63 (1978). *38 The Court of Appeals for the Fourth Circuit in Coastal Terminals, Inc. v. United States, 320 F.2d 333, 337 (4th Cir. 1963), stated: The purpose of Section 1031(a), as shown by its legislative history, is to defer recognition of gain or loss when a direct exchange of property between petitioner and another party takes place; a sale for cash does not qualify as a nontaxable exchange even though the cash is immediately reinvested in like property.
See also Starker v. United States, 602 F.2d 1341, 1352 (9th Cir. 1979). In Barker v. Commissioner, 74 T.C. 555, 561 (1980), this Court noted: The "exchange" requirement poses an analytical problem because it runs headlong into the familiar tax law maxim that the substance of a transaction controls over form. In a sense, the substance of a transaction in which the taxpayer sells property and immediately reinvests the proceeds in like-kind property is not much different from the substance of a transaction in which two parcels are exchanged without cash. Yet, if the exchange requirement is to have any significance at all, the perhaps *39 formalistic difference between the two types of transactions must, at least on occasion, engender different results. [Citations omitted.]
Petitioner's intent to exchange Wildridge Apartments is evidenced by the "Agreement of Purchase and Sale With Closing Instructions" entered into between petitioner and BHS Realty. [10]While "matters of taxation must be determined in the light of what was actually done rather than the declared purpose of the participants", J. H. Baird Publishing Co. v. Commissioner, 39 T.C. 608, 615 (1962) (citing Weiss v. Stearn, 265 U.S. 242 (1924)), intent is nevertheless relevant to a determination of what transpired. Barker v. Commissioner, supra at 564 (citing Carlton v. United States, 385 F.2d 238 (5th Cir. 1967)); see also Garcia v. Commissioner, 80 T.C. 491, 497-498 (1983); Biggs v. Commissioner, 69 T.C. 905, 915 (1978), affd. 632 F.2d 1171 (5th Cir. 1980). *40 Courts have afforded great latitude in structuring exchange transactions. Estate of Bowers v. Commissioner, 94 T.C. 582, 590 (1990); Biggs v. Commissioner, 69 T.C. at 918. While respondent raises many arguments with respect to this transaction, we agree with petitioner that much of this transaction falls within the ambit of cases that have addressed section 1031. See, e.g., Biggs v. Commissioner, supra (multiple parties can be involved in the exchange with parties not owning any property at the time of entering into an agreement to exchange); [11]Starker v. Commissioner, supra (the transfers need not occur simultaneously); [12]Barker v. Commissioner, supra at 562 (a party can hold transitory ownership solely for the purpose of effectuating an exchange); Mercantile Trust Co. v. Commissioner, 32 B.T.A. 82, 87 (1935) (alternative sales possibilities are ignored where conditions for an exchange are manifest and an exchange actually occurs); Alderson v. Commissioner, 317 F.2d 790 (9th Cir. 1963), revg. 38 T.C. 215 (1962) *41 (parties can amend a previously executed sales agreement to provide for an exchange); J. H. Baird Publishing Co. v. Commissioner, supra (the taxpayer can oversee improvements on the land to be acquired); Biggs v. Commissioner, 69 T.C. at 916-917 (the taxpayer can advance money toward the purchase price of the property to be acquired).
*42 Notwithstanding the liberal treatment afforded taxpayers, under certain circumstances, a transaction will be treated as a sale and not as an exchange. For purposes of this case, the transactions will not be treated as an exchange if (1) the taxpayer received or had control over the sales proceeds from the transaction, see Coupe v. Commissioner, 52 T.C. 394, 409 (1969); (2) the transfer of Wildridge Apartments and receipt of the Buellton Property was not part of an integrated plan, see Biggs v. Commissioner, supra; Greene v. Commissioner, T.C. Memo. 1991-403; Anderson v. Commissioner, T.C. Memo. 1985-205; or (3) Company acted as the taxpayer's agent for purposes of the exchange, see Coupe v. Commissioner, supra at 406; Mercantile Trust Co. v. Commissioner, supra at 85; Biggs v. Commissioner, 632 F.2d at 1178. A. Receipt or Control Over Wildridge Apartment Sales Proceeds
Respondent appears to argue that petitioner was in actual or constructive receipt of the escrow account *43 with Safeco Title. [13] We disagree and hold that there was no actual or constructive receipt of the sales proceeds. [14]Section 1.451-2(a), Income Tax Regs., provides: Income although not actually reduced to a taxpayer's possession is constructively received * * * [when] it is credited to his account, set apart for him, or otherwise made available * * *. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions. * * *
*44 On May 20, 1983, petitioner and BHS Realty entered into an "Agreement of Purchase and Sale With Closing Instructions", whereby petitioner agreed to sell Wildridge Apartments to BHS Realty. Section 11.11 provided that petitioner intended to first convey Wildridge Apartments to Company for purposes of arranging a like-kind exchange and that, in the event this occurred, BHS Realty would purchase Wildridge Apartments from Company. Petitioner also signed the agreement in his capacity as president of Company acknowledging that Company had read and understood all the terms and provisions. Under section 1.2 of the agreement, BHS Realty agreed to pay the purchase price as follows: (1) Upon execution of the agreement, deposit $ 200,000 in an interest bearing account with Safeco Title, the escrow agent; (2) on or prior to the closing of escrow, assume the obligations of seller under the $ 6,000,000 note and "First Deed of Trust" held by the Savings Bank of Puget Sound; (3) at the closing of escrow, execute and deliver to seller a "Second Deed of Trust" and promissory note made payable to seller in the amount of $ 1,500,000 bearing interest at 12 percent per annum, and the principal and interest *45 shall be due and payable on the first anniversary of the closing date; and (4) also on the closing date of escrow, pay the balance of the purchase price in the amount of $ 1,480,000 together with the $ 200,000 deposit and interest earned thereon, in cash. Section 5 of the agreement provides that the closing of escrow shall be on June 30, 1983. Schedule I, paragraph B, of the agreement provides: In the event that for any reason other than a default of one of the parties hereto the transactions contemplated hereby are not consummated on or prior to the Closing Date, then the Escrow shall terminate and Escrow Holder shall return the Deposit, together with accrued interest thereon, to Purchaser * * *
Pursuant to the agreement, on May 20, 1983, BHS Realty deposited $ 200,000 in an escrow account with Safeco Title. On June 10, 1983, petitioner entered into an "Agreement of Exchange of Property" with Company. On June 27, 1983, petitioner, in an individual capacity, and BHS Realty amended the escrow instructions to provide that the escrow holder was directed and authorized to release $ 200,000 on deposit in escrow, to seller herein subject to the receipt by escrow holder *46 of signed extension of the purchase contract through JULY 29, 1983, evidenced by sellers [sic] signature herein. * * *
That same day, petitioner conveyed Wildridge Apartments to Company and Company conveyed Wildridge Apartments to Wildridge Apartments, Ltd. On June 30, 1983, the $ 200,000 was released to Company from the sales escrow by Safeco Title. Based on the foregoing, we hold that petitioner was not in constructive receipt of the escrow funds. There were substantial restrictions preventing petitioner's ability to control the escrow funds. Petitioner and BHS Realty agreed that if the terms of the contemplated transactions could not be consummated, the $ 200,000 deposit plus interest was to be returned to BHS Realty. See Garcia v. Commissioner, 80 T.C. at 500; cf. Klein v. Commissioner, T.C. Memo. 1993-491. Also, even though petitioner, in his individual capacity, entered into and amended the escrow instructions on June 27, 1983, petitioner could not have amended the escrow instructions unilaterally; to the contrary, BHS Realty was a necessary party to the amendments. Cf. Klein v. Commissioner, supra. *47 Indeed, BHS Realty was a party to the amendments and authorized them. In a letter dated June 27, 1983, BHS Realty authorized Safeco Title to prepare an addendum to the "Agreement of Purchase and Sale With Closing Instructions" providing that the sum of $ 200,000 was to be released upon a signed extension of the purchase contract. Furthermore, the $ 200,000 deposit was not distributed until petitioner had conveyed the title to Wildridge Apartments to Company and Company had in turn conveyed the title to Wildridge Apartments, Ltd. Thus, the $ 200,000 was distributed to Company only after Company had replaced petitioner as seller under the escrow agreement. [15] See Garcia v. Commissioner, supra at 500. *48 B. Integrated Plan
Respondent argues that petitioner's purported exchange was not an integrated plan and that the "purported exchange consisted of the petitioner's structuring paper transactions around a pre-existing sales contract." Respondent contends that petitioner was contractually committed to sell Wildridge Apartments before he attempted the exchange and that the agreement to sell Wildridge Apartments was enforceable independent of any obligation to exchange the Buellton Property. To support this, respondent relies on the "Agreement of Purchase and Sale With Closing Instructions" entered into between petitioner and BHS Realty. Section 11.11 of the agreement, however, contemplates the type of like-kind exchange that was ultimately carried out. 11.11 * * * Seller * * * intends, prior to the Close of Escrow, to arrange a like-kind exchange, within the meaning of Section 1031 * * * whereby Seller shall exchange the Real Property, subject to the terms and provisions of this Agreement, for other property owned by * * * [Company] * * * Purchaser agrees * * * to purchase the Real Property from * * * [Company] * * * In no event shall the Closing Date be extended beyond *49 June 30, 1983 by reason of the exchange.
Furthermore, entering into a sales and escrow agreement before structuring an exchange, would not, in and of itself, invalidate a subsequent exchange. In Coupe v. Commissioner, 52 T.C. at 405, we stated: It is now well settled that when a taxpayer who is holding property for productive use in a trade or business enters into an agreement to sell the property for cash, but before there is substantial implementation of the transaction, arranges to exchange the property for other property of like kind, he receives the nonrecognition benefits of section 1031. * * * [Emphasis added.]
Respondent also appears to contend that petitioner had substantially implemented the purchase of the Buellton Property prior to structuring an exchange. We disagree. In Coupe, this Court applied the "substantial implementation" test to only one side of the transaction -- the sale of the taxpayer's property. In Estate of Bowers v. Commissioner, 94 T.C. 582 (1990), however, we applied the "substantial implementation" test to the other side of the transaction -- the property to be acquired *50 by the taxpayer. In Estate of Bowers, we stated that while taxpayers have been given considerable latitude in structuring like-kind exchanges, such latitude is not open-ended. Id. at 590. In Estate of Bowers, the taxpayers had entered into an agreement to sell an oil and gas lease to American Quasar Petroleum Co. (Quasar). On May 13, 1982, Quasar endorsed its acceptance of the agreement and made a $ 400,000 earnest money deposit. The balance of the sales price was to be paid upon delivery of an executed assignment of the lease. The assignment was to be made in 1983. Sometime prior to July 1982, the taxpayers entered into an agreement to purchase a farm from a trust. During 1982, the taxpayer conducted farming operations on the farm. On Schedule F of their 1982 return, the taxpayers reported income, expenses, and depreciation deductions related to their ownership and operation of the farm, resulting in a net farm loss of $ 130,491.41. Id. at 586. In 1983, the taxpayers attempted to restructure the sale of the lease and purchase of the farm as an exchange by (1) having the trust convey the farm to Quasar, *51 and (2) having Quasar assign the farm to the taxpayers in exchange for the taxpayers assigning the oil and gas lease to Quasar. Due to the taxpayers' 1982 involvement with the farm, we held that taxpayers were "at least in constructive possession of the farm after the * * * transactions in July 1982", id. at 585, and therefore the transaction was substantially implemented before the taxpayers' "attempt to recast the sale of the lease and the purchase of the farm in the mold of an 'exchange'." Id. at 591. The facts before us are distinguishable from those in Estate of Bowers. Petitioner, in this case, never acquired legal title to, or constructive possession of, the Buellton Property prior to entering into an agreement to exchange. All that petitioner acquired was an option to purchase the Buellton Property. A similar situation was presented in Coastal Terminals, Inc. v. United States, 320 F.2d 333 (4th Cir. 1963). In Coastal Terminals, Delhi-Taylor Oil Corp. (Delhi-Taylor) sought to purchase property owned by the taxpayer. Prior to this, the taxpayer had acquired options to *52 purchase certain real property and had entered into commitments to purchase steel for the construction of terminal facilities. Id. at 334. As part of an exchange, the taxpayer assigned the options and commitments to Delhi-Taylor. In the end, Delhi-Taylor conveyed completed terminal facilities to the taxpayer, and the taxpayer conveyed the property desired by Delhi-Taylor. In Coastal Terminals, the Court of Appeals for the Fourth Circuit held that the transaction was an exchange, id. at 339. In our view, the acquisition of an option to purchase real property is not "substantial implementation" of a purchase transaction. Petitioner was under no obligation to exercise the option. Had petitioner desired not to acquire the Buellton Property for purposes of an exchange, petitioner could have simply chosen not to exercise the option. These facts and the facts of Coastal Terminals are similar to the situation presented in Alderson v. Commissioner, 317 F.2d 790 (9th Cir. 1963), revg. 38 T.C. 215 (1962) (entering into a sales contract and later amending the *53 contract to provide for an exchange). The only difference is that the acquisition of an option to purchase involves the other side of the transaction, the purchase of the property desired by the taxpayer. Respondent points to the fact that the grant deed conveying Wildridge Apartments between petitioner and Company and the conveyance of the grant deed between Company and Wildridge Apartments, Ltd., were executed on the same day and then recorded on the same day. However, the fact that Company held only transitory ownership of Wildridge Apartments is not determinative. In Barker v. Commissioner, 74 T.C. 555, 562 (1980), this Court stated: it is not a bar to section 1031 treatment that the person who desires the taxpayer's property acquires and holds another piece of property only temporarily before exchanging it with the taxpayer. Similarly, it is not fatal to section 1031 treatment that the person with whom the taxpayer exchanges his property immediately sells the newly acquired property. [Citations and fn. ref. omitted.]
Similarly, in Alderson v. Commissioner, 317 F.2d at 795, the Court of Appeals for *54 the Ninth Circuit stated: The Mercantile case appears to hold that one need not assume the benefits and burdens of ownership in property before exchanging it but may properly acquire title solely for the purpose of exchange and accept title and transfer it in exchange for other like property * * * [Emphasis in original.]
Based on the foregoing, we hold that petitioner structured an integrated four-party exchange: (1) Petitioner was to convey Wildridge Apartments; (2) BHS Realty, and then later Wildridge Apartments, Ltd., was the prospective purchaser of the Wildridge Apartments; (3) J. and M. Brock Living Trust and the Trustee for the Parks and Brock Unitrust were the prospective sellers of the Buellton Property; and (4) Company was the party who received Wildridge Apartments from petitioner, sold it to Wildridge Apartments, Ltd., and then purchased the Buellton Property, made improvements thereon, and transferred it to petitioner. C. Agent
Respondent contends that Company was a mere conduit or agent for petitioner. In Coupe v. Commissioner, 52 T.C. at 406, we agreed that an exchange would be meaningless for purposes of section 1031 *55 if the person with whom the taxpayer made the exchange was acting as the taxpayer's agent. See also Mercantile Trust Co. v. Commissioner, 32 B.T.A. 82, 84 (1935). Company accepted title to Wildridge Apartments, albeit at petitioner's request, in order to facilitate the exchange. Company also accepted title to the Buellton Property for the purpose of facilitating the exchange and for the additional purpose of constructing improvements thereon. [16] See J. H. Baird Publishing Co. v. Commissioner, 39 T.C. 608 (1962). This is not a case of petitioner using Company as a "sham" or "straw man". See Garcia v. Commissioner, 80 T.C. 491, 500-501 (1983). Company was an active corporation carrying on business as a licensed building contractor and real estate developer. Furthermore, from the proceeds of the sale of Wildridge Apartments, Company purchased the Buellton Property, acquired financing for the purpose of constructing improvements thereon, and transferred title to the property and improvements subject to the Company's obligations for a fee of $ 750,000. Company was not a mere conduit or *56 agent of petitioner. We have considered respondent's arguments on this point and find them to be without merit. We, therefore, hold that petitioner is entitled to the nonrecognition treatment of section 1031. *57 Issue 2. Section 1031(b)
Respondent alternatively argues that if the conveyance of Wildridge Apartments qualifies as a like-kind exchange under section 1031(a), petitioner, nevertheless, failed to recognize gain to the extent of boot received. Section 1031(b) provides: If an exchange would be within the provisions of subsection (a) * * * if it were not for the fact that the property received in exchange consists not only of property permitted by such provisions to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property.
Respondent contends that by refinancing Wildridge Apartments 1 week after entering into the sales contract with BHS Realty, petitioner received over $ 2,020,407.33 in "other property or money" representing the amount petitioner "cashed out" of his investment. We disagree. Section 1031(b) relates to property received in the exchange that consists of the exchange property and "other property or money". The only property petitioner received in exchange for *58 his property was the Buellton Property. In addition, petitioner's liabilities were well in excess of the $ 6 million he owed with respect to the Wildridge Apartments. See 1.1031(b)-1(c), Income Tax Regs.; Garcia v. Commissioner, supra.Petitioner received the $ 2,020,407.33 from the Savings Bank of Puget Sound as a result of refinancing Wildridge Apartments. He did not receive it from Company as part of the exchange. Furthermore, we disagree with respondent's argument that "if the petitioner's sale of the Wildridge apartments and his acquisition of the Buellton property were to be construed as integrated events, his refinancing the Wildridge mortgage should likewise be construed as a part of that plan." Petitioner had reasons for refinancing the mortgage that were unrelated to the exchange. Petitioner's uncontroverted testimony was that he began attempts to secure permanent long-term financing in the same year he purchased Wildridge Apartments (1980). Petitioner also testified that due to rising interest rates he had difficulty obtaining long-term financing. On September 28, 1981, the interest rate on the note was 23.5 percent. In 1982, *59 petitioner made a $ 500,000 payment on the promissory note and, in consideration of this payment, the note was extended for one more year. On April 12, 1983, the Savings Bank of Puget Sound signed a loan commitment letter for the refinancing of Wildridge Apartments in the amount of $ 6 million. [17] Furthermore, the settlement of the Savings Bank of Puget Sound loan on June 2, 1983, was timely and significant since the due date of the $ 3.5 million loan was July 9, 1983. For example, in the event the exchange or sale failed, petitioner nonetheless was in need of refinancing Wildridge Apartments. Accordingly, we hold that petitioner did not receive other property or money other than the Buellton Property in exchange for Wildridge Apartments. Therefore, petitioner is not required to recognize boot pursuant to section 1031(b). *60 [18]
Decision will be entered for petitioner. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The "Option Agreement" provided that the "option was granted because of the personal involvement" of petitioner, that the option could not be assigned by petitioner, and that "Any such purported assignment shall be void and of no force or effect and shall constitute a default" by petitioner. No such assignment restriction was imposed on the Trust. The Trust gifted a portion of the property, subject to the option, to the Parks and Brock Unitrust.↩
3. Paragraph 11 of this agreement provides: "This agreement is executed concurrently with the Option Agreement and Purchase Agreement and Escrow Instructions and shall be interpreted therewith as though one document."↩
4. Paragraph 10 of this agreement provides: Non-Assignability↩. Except as provided herein, Buyer may not (a) assign his rights under this Purchase Agreement and Escrow Instructions to any person or entity or (b) designate a nominee or other person or entity to receive title to the Property without the prior written consent of Seller, which consent shall not be unreasonably withheld providing Buyer has a controlling interest in such entity, and such act shall not relieve Buyer from the obligations created herein. Any attempted assignment or designation contrary to the foregoing shall be void and of no force or effect and shall constitute a default by Buyer hereunder.
5. Company, however, did not own the Buellton Property at the time the agreement was executed.↩
6. The promissory note was reduced by $ 10,000 from the original principal of $ 1,500,000 to $ 1,490,000. The note bore interest at 12 percent per annum, with the principal and interest due and payable on the first anniversary of July 8, 1983.↩
7. There is no direct evidence showing how or to whom Wildridge Apartments, Ltd., paid the balance of the purchase price. Respondent does not allege that petitioner received it personally. Therefore, we find Wildridge Apartments, Ltd., paid the balance of the purchase price to Company.↩
8. Sec. 1031(a) provides: (a) Nonrecognition of Gain or Loss From Exchanges Solely in Kind. -- No gain or loss shall be recognized if property held for productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale, nor stocks, bonds, notes, choses in action, certificates of trust or beneficial interest, or other securities or evidences of indebtedness or interest) is exchanged solely for property of a like kind to be held either for productive use in trade or business or for investment.↩
9. The parties have stipulated that "Wildridge and Buellton were and are real properties. Throughout petitioner's entire period of ownership, these real properties were held by him for productive use in his trade or business or for investment."↩
10. The Agreement provides: 11.11 Section 1031 Exchange. Seller * * * intends, prior to the Close of Escrow, to arrange a like-kind exchange, within the meaning of Section 1031↩ * * * whereby Seller shall exchange the Real Property, subject to the terms and provisions of this Agreement, for other property owned by [Company] * * * Purchaser agrees * * * to purchase the Real Property from the [Company]. * * * In no event shall the Closing Date be extended beyond June 30, 1983 by reason of the exchange.
11. In 1989, Congress added sec. 1031(f) and (g)↩ (exchanges between related parties). Omnibus Reconciliation Act of 1989, Pub. L. 101-239, sec. 7601(a), 103 Stat. 2370-2371. The transactions in this case occurred before the effective date of this amendment.
12. In 1984, Congress added sec. 1031(a)(3), which provides that a transfer will not be treated as a like-kind exchange unless the exchange property is (a) identified within 45 days after the transfer of the underlying property, and (b) received by the transferor within the earlier of 180 days after the transfer of the underlying property or the due date for the transferor's tax return on which the exchange would be reported. Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 77(a), 98 Stat. 596. Sec. 1031(a)(3) applies to transactions after July 18, 1984, or to transactions on or before July 18, 1984, if the exchange property was not received before Jan. 1, 1987. Since petitioner received the Buellton Property before Jan. 1, 1987, sec. 1031(a)(3)↩ places no time limit on the exchange.
13. We assume from the following statement made on brief that respondent raised actual and constructive receipt arguments: Had the petitioner and the corporation dealt at arm's length, they would have used separate, inviolable escrow accounts. Instead, they used the same escrow account from which the petitioner received, at his own direction, a premature disbursement of the buyer's $ 200,000 deposit.↩
14. While respondent argues that the $ 200,000 was paid directly to petitioner, we have found, and the parties have stipulated, that the $ 200,000 was paid to Company. Therefore, petitioner was not in actual receipt of the escrow funds.↩
15. Petitioner acted as a party to the escrow agreement only during the time he held title to Wildridge Apartments, or in other words, while he was the seller of Wildridge Apartments. This is further illustrated by subsequent amendments to the escrow agreement. On July 8, 1983, petitioner, in his capacity as president of Company, and Wildridge Apartments, Ltd., amended the escrow instructions. Thus, by this time, both parties to the original escrow agreement had been replaced by Company as seller and Wildridge Apartments, Ltd., as purchaser. The escrow account was again amended on July 12, 1983, by petitioner, as president of Company, and by Wildridge Apartments, Ltd.↩
16. The fact that Company was used to facilitate the like-kind exchange does not mean that Company was a mere agent of petitioner. In Biggs v. Commissioner, 632 F.2d 1171, 1178 (5th Cir. 1980), affg. 69 T.C. 905 (1978), the Court of Appeals for the Fifth Circuit stated: Finally, we examine the Commissioner's claim that Shore was serving as an agent for Biggs throughout the transactions, and that the accomplishment of the intended exchange was thereby precluded. Admittedly, the exchange would have been meaningless if Shore, acting as Biggs' agent, acquired title to the Virginia property and then executed the deed conveying title to Biggs. For, in essence, Biggs would have merely effected an exchange with himself. However, while the Tax Court refused to find, in contrast to its decision in Coupe, that Shore acted as an agent for the purchaser, Powell, it also specifically determined that Shore was not an agent of Biggs. Rather, Shore accepted title to the Virginia property, albeit at Biggs' request, merely in order to facilitate the exchange. We believe that this is an accurate characterization of Shore's role in the transactions. Consequently, we reject the Commissioner's agency notion also. Undoubtedly, the exchange of the Maryland and Virginia properties could have been more artfully accomplished and with a greater economy of steps. However, we must conclude on the facts before us that the taxpayer ultimately achieved the intended result. * * * [Citation and fn. ref. omitted.]↩
17. The Savings Bank of Puget Sound signed the loan commitment letter over 1 month prior to the date in which petitioner entered into the agreement to sell Wildridge Apartments to BHS Realty.↩
18. Based on the foregoing, petitioner is not liable for the addition to tax as determined by respondent.↩